

FILED

APR 1 2 2012

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

***POSTED ON WEBSITE***
***NOT FOR PUBLICATION***

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| In re: ) | Case No. 10-36676-D-11 |
| ) | |
| SUNDANCE SELF STORAGE- ) | Docket Control Nos. CAH-26, |
| EL DORADO LP, ) | FDS-6 |
| ) | |
| ) | Date:  March 28, 2012 |
| ) | Time:  9:30 a.m. |
| Debtor. ) | Dept:  D |
| ) | |

**This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of claim preclusion or issue preclusion.**

<u>MEMORANDUM DECISION</u>

On June 25, 2010 (the "Petition Date"), Sundance Self Storage-El Dorado LP (the "Debtor") commenced a voluntary bankruptcy case under chapter 11 of title 11 of the United States Code.[1]  On October 14, 2011, the Debtor, Peninsula Capital Group, Inc. ("Peninsula"), and Howard A. Brown, III ("Mr. Brown") (collectively, the "Plan Proponents") filed Sundance Self Storage-El Dorado LP's Amended Plan of Reorganization and Amended Disclosure Statement.[2]  Subsequently, on November 16, 2011, the

_____

    1.  Unless otherwise indicated, all Code, chapter, and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.  All Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

    2.  The Debtor and Howard A. Brown, III -- president of Peninsula Capital Group, Inc. -- filed the original plan of reorganization and disclosure statement on February 10, 2011. The first amended plan and disclosure statement were filed on

1  Plan Proponents filed Sundance Self Storage-El Dorado LP's 1st

2  Modified Amended Plan of Reorganization ("Modified Plan") and

3  Disclosure Statement Describing Debtor's 1st Modified Amended Plan

4  ("Modified Disclosure Statement").[3]

5      The court issued an order on November 17, 2011 approving the

6  Modified Disclosure Statement and set deadlines for the

7  submission of ballots, objections to confirmation of the Modified

8  Plan, responses to objections, tabulation of ballots, and a

9  memorandum demonstrating compliance with confirmation

10 requirements under § 1129.  Secured Creditor, U.S. Bank National

11 Association (the "Bank"),[4] elected to have its claim treated as a

12 fully secured claim pursuant to § 1111(b) prior to the conclusion

13 of the hearing on the disclosure statement.

14     On January 9, 2012, the Bank filed U.S. Bank's Objection to

15 Confirmation of Debtor's 1st Modified Amended Plan of

16 ─────────────

17 June 10, 2011; the second amended plan and disclosure statement
   were filed on August 19, 2011; and the third amended plan and

18 disclosure statement were filed on October 14, 2011.  (Peninsula
   joined as one of the Plan Proponents with the filing of the third
   amended plan and disclosure statement.)

19

20     3.  Although the court approved the Disclosure Statement on
   November 9, 2011, it allowed the Plan Proponents to supplement

21 the Disclosure Statement to make it explicit that, following a
   successful motion by the Bank that valued the secured portion of

22 those creditors's claims at $0.00, the joint creditors placed in
   Class 3 were determined to have an unsecured claim under §

23 506(a).  The court also allowed the Plan Proponents to supplement
   certain exhibits that were omitted at the time of the hearing on

24 the adequacy of the Disclosure Statement.

25     The Plan Proponents also modified the Plan to clarify that
   the Class 3 claim would be placed in Class 5 along with the other

26 general unsecured claims, and changed the distribution to Class
   5.

27     4.  The Bank holds a first deed of trust against real

28 property located at 2341 Hidden Acres Drive in El Dorado Hills,
   California (the "El Dorado Hills Property").

Reorganization Dated October 14, 2011 (the "Objection").  A
hearing was held on January 25, 2011 -- the date originally set
for the confirmation hearing; the court treated the hearing as a
status conference and specially set the matter for March 28, 2012
at 9:30 a.m. (the "Confirmation Hearing"), for an evidentiary
hearing.[5]

   For the reasons set forth below, the court concludes that
the Modified Plan does not satisfy all the requirements of §
1129, and therefore, the Modified Plan will not be confirmed.

## I. FACTUAL BACKGROUND

A.  TERMS OF THE MODIFIED PLAN

   The Modified Plan proposes to pay creditors of the Debtor
from cash flow generated from operations of the business and an
infusion of capital.  It provides that administrative expenses
comprised of professional fees will total $35,000, where $20,000
will be paid on the effective date of the Modified Plan (subject
to court approval), and the remaining balance will be paid at the
rate of $1,500 per month until paid in full.

   In Article IV of the Modified Plan, the Plan Proponents set
forth the manner in which claims and interests will be treated.
The proposed treatment of the six different classes of claims and
interests is as follows:

### Class 1 (Priority Claims)

   There are no priority unsecured claims.  The Debtor states

─────────────────

   5.  While the evidentiary record with respect to
confirmation closed as of January 25, 2012, the court allowed the
parties in interest to conduct cross-examination and re-direct
examination at the Confirmation Hearing, limited in scope to the
evidence submitted as of January 25, 2012.

that it remains current on taxes, except for secured property tax.  In the event that priority claims do exist, they will be paid on the effective date of the Modified Plan.

## Class 2 (The Bank's Claim)

Class 2 is comprised of the secured claim of the Bank.  As stated earlier, the Bank has elected to have its claim treated as fully secured under § 1111(b).  Upon making the election, the Bank has a fully secured claim in the amount of $6,144,284.37.[6] The Modified Plan provides for monthly payments of $33,738.93; the payments are based on principal and interest at a rate of 5.2% per annum, amortized over 30 years.  A final balloon payment is to be paid on or before the 36th month after the effective date of the Modified Plan.[7]  Based on this treatment, Class 2 is impaired.

## Class 3 (Claim of the Holders of Second Deed of Trust on the El Dorado Hills Property)

Class 3 consists of the claim of joint holders of a second deed of trust on the El Dorado Hills Property in an estimated amount of $360,000.  On October 6, 2011, the court valued the Class 3 secured claim at $0.00, effectively rendering the Class 3 claim an unsecured claim for the purposes of plan confirmation.

---

6.  Excluding interest, fees, and costs that have accrued post-petition, this amount reflects the total amount of the Bank's claim as of the Petition Date.

7.  The Debtor states that it is willing to stipulate with the Bank that the Debtor be required to make interest-only payments at a rate of 6.0% for 36 months instead.  In the event that the Debtor and the Bank stipulated to an interest-only arrangement, the proposed monthly payment is $30,721.42.  There has been no such stipulation.  As such, this decision will refer only to the payments based on principal and interest at a rate of 5.2% per annum.

- 4 -

Thus, the treatment of the Class 3 claim is described below in the treatment for Class 5.

### Class 4 (The El Dorado County Tax Collector's Claim)

Class 4 consists of the secured tax claim of the El Dorado County Tax Collector. The El Dorado County Tax Collector has a statutory lien against the El Dorado Hills Property in a total amount of $96,545.75. The Debtor has entered into a five-year payment plan with the El Dorado County Tax Collector; the Debtor has incorporated this agreement into the terms of the Modified Plan. Pursuant to this agreement, the Debtor will make five equal annual installments, of principal and interest in April of each year for five years. In addition, the Debtor is required to pay each year's annual tax in full and on time.

The Debtor already made the first payment that was due in April of 2012. The Debtor has also paid the current year's post-petition tax obligation. As stated below, the court has found that the incorporation of the payment plan, negotiated post-petition, does not mean that the Modified Plan has altered the rights of the El Dorado County Tax Collector. As such, Class 4 is <u>unimpaired</u>.

### Class 5 (General Unsecured Claims)

Class 5 is comprised of 13 different claims.[8] The Modified Plan will pay $15,000 to the general unsecured creditors, on a pro rata basis, within 75 days of the effective date of the

---

8.  Upon resolution of various claim objections filed by the Bank, the court has found that, for voting purposes only, the scheduled claim of Lola Brekke is allowed in the amount of $175,000 and would be included in Class 5, and that the claim of Mark and Laura Obrochta was duplicative and was excluded from Class 5 for the purpose of computing the ballot tabulation.

Modified Plan, or after final resolution on any disputed claims, whichever occurs later.  This arrangement results in an estimated pro rata distribution to Class 5 of 1.3744%.  Accordingly, Class 5 is <u>impaired</u>.

### Class 6 (Equity Interests)

Class 6 consists of the equity interests of the Debtor's equity holders.  The Modified Plan provides that the equity holders will inject "new value" flowing from a post-petition, pre-confirmation capital call by the partnership in an amount of $225,000, which is currently being held in a trust account by the Debtor's attorney (the "Capital Call").  As more fully described below, the Modified Plan also requires that certain parties guarantee the 36 monthly payments to Class 2 to the extent that there is a deficit.  Although the Modified Plan indicates that Class 6 is impaired, the equity interests actually remain intact and appear to be treated pursuant to the terms of the underlying partnership agreement.  Thus, the court concludes that Class 6 is <u>unimpaired</u>.

### Implementation of the Plan

Peninsula has been and will continue to be the general partner of the Debtor (as a reorganized entity).  Peninsula has hired Bryden Property Management ("Bryden") to manage the reorganized debtor.  If the Modified Plan is confirmed, Bryden will remain the resident manager of the El Dorado Hills Property under the supervision of Peninsula.

According to the terms of the Modified Plan, Don Smith's ("Mr. Smith") managerial role will end within 60 days of the effective date of the Modified Plan.  Mr. Smith's tax and

- 6 -

accounting firm, however, will continue to provide bookkeeping and financial reporting services to Peninsula after the Modified Plan is confirmed.

The Modified Plan contemplates that the Debtor will continue to operate its self-storage business, and the income generated therefrom will be used to pay operating expenses, including the payments owed to the Bank on account of its Class 2 claim.  The Modified Plan also provides that if operating funds from the business fall short, Peninsula will make additional capital contributions above and beyond the funds stemming from the Capital Call, once exhausted.  Moreover, Mr. Brown will personally guarantee the 36 monthly payments to the Bank on account of its Class 2 claim.[9]

The Modified Plan sets forth an allocation of how the Capital Call funds will be put to use:

- Legal Fees ($20,000)
- Payments to Class 5 Creditors ($15,000)
- Payment of December 2011 Property Tax ($32,500)
- Reserve for April 2012 Payment to Class 4 ($30,000)
- Reserve for April 2013 Payment to Class 4 ($30,000)

This allocation consumes $127,500 of the Capital Call funds, leaving a balance of $97,500 for the Debtor to meet other obligations under the Modified Plan (the "Operating Reserve").

Finally, the Modified Plan sets forth three scenarios that will enable the Debtor to satisfy the balloon payment to the Bank

---

9.  At the confirmation hearing, the Plan Proponents acknowledged that Mr. Brown's commitment is narrowly tailored to guaranteeing the three-year's worth of monthly payments -- not the balloon payment or any other obligation.

when it comes due 36 months following the effective date:

1.    The El Dorado Hills Property can be sold;

2.    The partnership can sell an equity interest in the partnership to a new investor; or

3.    The Debtor can acquire a new loan and refinance the El Dorado Hills Property.

B.    <u>THE RESULTS OF VOTING AND OBJECTION TO TABULATION</u>

On January 18, 2012, the Plan Proponents filed Creditor's Tabulation of Ballots, Docket Number 353.  A total of 11 ballots were submitted to the Debtor's attorney; the results of voting were as follows:

- Class 2 - Accepting ($0, 0 votes)
                 Rejecting ($6,144,284.37, 1 vote)
- Class 4 - Accepting ($96,545.75, 1 vote)
                 Rejecting ($0, 0 votes)
- Class 5 - Accepting ($741,459, 6 votes)
                 Rejecting ($15,000, 1 vote)
- Class 6 - Accepting (2 votes)
                 Rejecting (0 votes)

On February 21, 2012, the Bank filed Motion by U.S. Bank National Association to Exclude Ballots from Tabulation for Purposes of Plan Confirmation, Docket Number 411 (the "Tabulation Motion").

The court granted the Tabulation Motion in part, and adjusted the tabulation of ballots accordingly.  Taking into account the resolution of the Tabulation Motion and claim objections filed by the Bank, the adjusted tabulation of the ballots is as follows:

- Class 1 - (no voting)

- Class 2 - Accepting ($0, 0 votes)
  - Rejecting ($6,144,284.37, 1 vote)
- Class 3 - (voted as Class 5 claim)
- Class 4 - Accepting ($96,545.75, 1 vote)
  - Rejecting ($0, 0 votes)
- Class 5 - Accepting ($560,000, 4 votes)
  - Rejecting ($15,000, 1 vote)
- Class 6 - Accepting (2 votes)
  - Rejecting (0 votes)

Although the court found that Class 4 is not an impaired accepting class, Class 5 is. For the reasons stated on the record, the court finds that Class 5 accepted the Modified Plan, without considering the votes of insiders. As stated on the record, the court also determined that Class 6 is not impaired, although it did vote to accept the Modified Plan. When the dust settled, the only class to reject the Modified Plan was Class 2.

C. THE POSITIONS OF THE PARTIES

1. **The Objection**

As stated earlier, the Bank filed the Objection, which argues that there are various fatal infirmities in the Modified Plan. In particular, the Bank argues that (1) the Modified Plan is not feasible under § 1129(a)(11); (2) the Modified Plan is not fair and equitable to Class 2 in that the proposed rate of interest payable on the Bank's Class 2 claim is too low; and (3) the Modified Plan violates the absolute priority rule.

**Feasibility**

The first aspect of the Bank's feasibility argument is that the Debtor cannot make the balloon payment, 36 months out, that

will be $5,876,058 on the low end, and as high as $6,144.284.
Also, the Bank asserts that the Debtor does not have the ability
to make the monthly payments called for by the Modified Plan.
The Bank emphasizes that, as described below, the Debtor's own
projections undercut the Modified Plan's feasibility.

The Bank also argues that the Debtor's revised projections
understate the Debtor's expenses.  For instance, the projections
do not account for the $15,000 in attorney's fees that will be
paid at $1,500 per month until paid in full;[10] property taxes are
projected to be $54,000 per year instead of the current annual
property tax of approximately $65,590; utilities are understated
by approximately $2,600 per year; potential payroll tax liability
has not been taken into account by the Debtor; and the Debtor
projects that expenses will remain static over the three-year
payment period.

The Bank further posits that its § 1111(b) entitles it to a
larger balloon payment than the one set forth in the Modified
Plan.  The Bank claims that when an under-secured creditor makes
the § 1111(b) election, any allowed attorney-fee claim becomes
part of the secured amount.  Thus, the Bank states that the
Modified Plan's proposed balloon payment does not include an
estimate for attorney's fees that get bundled into the secured
amount of the Bank's claim.

The Bank asserts two additional shortcomings as part of its
multi-faceted feasibility argument.  First, the Bank highlights

_____

10.  At the Confirmation Hearing, Mr. Smith confirmed that
the projections on which the Modified Plan is based do not
account for these installment payments.

- 10 -

that, pursuant to the cash collateral stipulation between the
Bank and the Debtor,[11] the Bank has a super-priority
administrative expense claim of over $200,000.  According to the
Bank, the Debtor underestimated administrative expenses in its
feasibility analysis by not providing for the payment of the
super-priority administrative expense at all.  Likewise, the Bank
claims that it has a lien on $50,496.08 that existed on the
Petition Date, but that the Bank only discovered until later in
the case.  The Bank argues that the administrative-expense
priority should extend to this amount as well.  Second, the Bank
argues that the Debtor's current management will not be able to
bring about the necessary performance improvements to ensure a
successful outcome under the Modified Plan.[12]

**Fair and Equitable Treatment -- "Cramdown" Interest Rate**

The Objection also argues that the "cram-down" interest rate
associated with the monthly payments for the Class 2 claim is not
a fair rate.  As stated earlier, although the Modified Plan
proposes two different interest rates, the default rate of 5.2%
per annum is the one that applies to the Bank's claim.

The Banks asserts that the 5.2% rate set under the Modified
Plan unfairly shifts the risks to the Bank.  As a result, the
interest rate renders the Modified Plan as not fair and equitable

---

11.  Amended and Restated Stipulation Authorizing Debtor to
(1) Use Cash Collateral, (2) Grant Adequate Protection and
Replacement Liens to U.S. Bank National Association, and (3)
Modify the Automatic Stay, filed on October 12, 2010, Docket
Number 98.

12.  The court reaches its conclusion that the Modified Plan
is not feasible without considering these last two arguments of
the Bank.  Accordingly, these last two points will not be
discussed.

to the Bank's Class 2 claim under § 1129(b)(2)(A)(i).  The Bank
points to the significant risk of default inherent in the
Modified Plan, and emphasizes that the Bank's claim entails a
loan-to-value ratio that is greater than 100%.[13]

### Absolute Priority Rule Violation

The final leg of the Objection is that the Modified Plan
might run afoul of the absolute priority rule as codified by §
1129(b)(2)(B).  Significantly, the Bank's absolute priority rule
argument is couched in contingent terms: "It is presently unknown
how the unsecured creditors will vote on the Plan.  If they
reject it, the Court will need to consider the effect of the
absolute priority rule of section 1129(b)(2)(B)."  Since the
results of voting are in, the Bank's absolute priority rule
argument is moot.  The class of unsecured claims (Class 5) has
voted to accept the Modified Plan.  Thus, there is no absolute
priority problem.

## 2.  The Position of the Plan Proponents

The Plan Proponents rely on past revenue history to project
future revenue streams that will serve as the primary source of
funding for the Modified Plan.  Moreover, the Plan Proponents
fall back on Mr. Brown's willingness to personally guarantee the
36 monthly payments to the Bank in the event there is a shortfall
or deficiency in the operating income.  In regards to the balloon

---

13.  The El Dorado Hills Property has a current value of
$5,940,000, and the Bank's claim is greater than $6,000,000.
Based on those circumstances, the Bank correctly concludes that
the loan has a loan-to-value ratio greater than 100%.  The
reality is that upon making the § 1111(b) election, the Bank's
claim is a fully secured claim, which actually results in a loan-
to-value ratio of exactly 100%.

payment, the Plan Proponents rely on the Debtor's ability to refinance the El Dorado Hills Property, a potential sale of equity interests to raise cash, or the eventual sale of the El Dorado Hills Property to pay the Bank's claim 36 months out.  The Plan Proponents also posit that the Modified Plan is fair and equitable under § 1129(b)(2)(A) with respect to Class 2 because the "cramdown" rate of interest of 5.2% per annum is a commercially reasonable rate.

### 3.  The Evidence

The Bank's evidence consists of the Declaration of Jane K. Springwater with Schedule of Evidence, filed January 9, 2012, Docket Numbers 337 & 338 ("Dec. Springwater") and the Declaration of Kurt Scheidt ("Mr. Scheidt"), filed January 9, 2012, Docket Number 339 ("Dec. Scheidt").  The Plan Proponents's evidence consists of the Declaration of Nick Hayhurst ("Mr. Hayhurst"), filed January 17, 2012, Docket Number 347 ("Dec. Hayhurst") and the Declaration of Don Smith ("Mr. Smith"), filed January 17, 2012 ("Dec. Smith"), and the Debtor's Revised Projection as of November 30, 2011, Docket Number 309 (the "Projections").  Mr. Brown, the purported guarantor of the monthly payments to Class 2, did not file a declaration or any other financial information to demonstrate his financial wherewithal.

Although both Mr. Scheidt and Mr. Hayhurst qualify as experts, the court finds Mr. Scheidt is notably more qualified than Mr. Hayhurst and that Mr. Scheidt demonstrated significantly more experience in the self-storage industry.  Mr. Scheidt has established a track record with investments in self-storage facilities, whereas Mr. Hayhurst's experience is in commercial

- 13 -

lending in general.[14]  Mr. Hayhurst's declaration makes only
generic statements regarding small-business commercial-loan
products, without applying general underwriting standards and
market conditions to the facts of this case.  Essentially, Mr.
Hayhurst only draws conclusions without providing support or
applying underwriting standards to the Debtor.

Under the Plan Proponents's worst-case scenario, which
assumes three year's worth of payments with interest accruing at
5.2%, the Debtor will have cumulative losses of $351,576.[15]
Moreover, the Projections in that scenario assume a steady stream
of income at $45,000 and static expenses.[16]  By contrast, under
the Plan Proponents' best-case scenario, which assumes three
year's worth of payments with interest accruing at 5.2%, the
Debtor will have cumulative, net income of $106,824.[17]  The
Projections under the best-case scenario assume a variable income
stream of $51,000 (Year 1 at 75% occupancy), $56,000 (Year 2 at
80% occupancy), and $61,200 (Year 3 at 85% occupancy); that
scenario also projects static expenses.[18]  However, Mr. Smith's
testimony significantly undercuts the accuracy of the best-case

---

14.  Dec. Scheidt, Exh. A at 1 ("[Mr. Scheidt's firm] has specialized strictly in income property loan production, including office, retail, multi-family, industrial *and self-storage*" and "presently has 31 assignments [as court-appointed receivers for distressed commercial real estate assets] . . . including office, retail, multi-family *and self-storage*.") (emphasis added).  Mr. Hayhurst has not demonstrated similar experience.

15.  Dec. Springwater, Exh. A at 7.

16.  Id.

17.  Id. at 13.

18.  Id. at 11-13.

- 14 -

1  scenario -- as at 84% occupancy, the expected gross rent was only
2  around $49,000, nowhere near the $61,200 at 85% occupancy set in
3  the Projections.

4       The Modified Plan acknowledges that additional funds will be
5  needed to shore up expected losses after the Operating Reserve is
6  depleted.  Since the Modified Plan's feasibility hinges on the
7  timely payment of the Class 2 claim -- including the balloon
8  payment --  the Modified Plan calls for an additional capital
9  call, a guarantee of the monthly payments by Mr. Brown, the sale
10 of additional equity interests, or the refinancing or sale of the
11 El Dorado Hills Property.[19]  Although the Modified Plan
12 contemplates these contingencies, the Plan Proponents did not
13 submit any evidence to support Mr. Brown's financial resources,
14 or his specific involvement or role in seeking a refinancing of
15 the El Dorado Hills Property.  In fact, at the Confirmation
16 Hearing, the Plan Proponents acknowledged that Mr. Brown would
17 guarantee only the monthly payments -- nothing more.

18      The best-case scenario assumes that the Debtor will generate
19 $61,200 per month if the Debtor's occupancy rate is 85%.   As
20 stated earlier, Mr. Smith testified that the Debtor has achieved
21 an occupancy rate of 84%, and that the additional income
22 generated from the increase in occupancy will result in only
23 approximately $49,000 per month.[20]  Mr. Smith also testified that
24 the Projections do not account for the $1,500 monthly payments to
25 the Debtor's attorney contemplated by the Modified Plan.  Simply

26

27      19.  Dec. Smith at 5:10-21.

28      20.  The Projections also keep expenses static for the three
   year period covered.

- 15 -

put, the Projections appear to be overly optimistic, rather than realistic.

The declarations of Mr. Hayhurst and Mr. Scheidt and additionally, the cross-examination testimony of Mr. Scheidt, provided unrebutted evidence on the realities of the market for loans to self-storage facilities.  Mr. Hayhurst, testified that "new and refinance loans are currently available for self-storage facilities, which would include the [Debtor], subject to lenders [sic] approval."[21]  Mr. Hayhurst also stated that "[t]he lending sources which provide refinancing for self-storage facilities offer rates subject to the lenders [sic] diligence, underwriting, and specific qualifying conditions," and "[t]hese loans can be arranged up to 90% of the appraised value of the property," assuming "that the borrowers are creditworthy and the property is in good condition."[22]  Mr. Hayhurst's declaration further states that a total loan can be arranged for up to 90% of the appraised value of the property, where an institutional lender (such as the Bank) would cover the first 50%, and a Certified Development Corporation ("CDC"), through an SBA-504 loan, would guarantee the remaining 40%.[23]  However, Mr. Hayhurst failed to give any analysis, meaningful or otherwise, as to the necessary underwriting standard a lender would use to determine whether the Debtor would qualify for such a loan or loans three years down the road.

_____

21.  Dec. Hayhurst at 2:19-21.

22.  Id. at 2:21-25.

23.  Id. at 3.

On the other hand, the Bank's expert, Mr. Scheidt, based his assessment on the Plan Proponents's best-case scenario, and testified that "[p]ricing for 10 year, fixed rate, non-recourse debt [for refinancing construction loans used to build projects such as the Debtor's] ranges from 5% . . . to 6%," and "[b]anks for shorter term loans are in the 4% to 4.5% range," assuming a 65% loan-to-value ("LTV") ratio.[24] Mr. Scheidt further testified that "if [the Debtor] qualified for an [SBA-504 loan]," it could acquire that loan on an 85%-LTV basis, "depending on whether the loan is for construction or refinance."[25] This arrangement, according to Mr. Scheidt, contemplates a combination of a loan from an institutional lender and an SBA loan through a CDC.[26] Mr. Scheidt's analysis then emphasized the need for "a combination of first mortgage debt, mezzanine financing (secured by partnership interest, not the property), and new equity."[27] He concluded that after blending the rates for only the debt portion (first and mezzanine), the appropriate rate of interest is 8.4% per annum. The court finds Mr. Scheidt's declaration and testimony to be much more persuasive as he applied specific underwriting standards to the Debtor.

## II. ANALYSIS

This court has jurisdiction over confirmation of the Modified Plan pursuant to 28 U.S.C. § 1334(b) and the authority

---

24. Dec. Scheidt, Ex. B, at 1.

25. Id. at 2.

26. Id.

27. Dec. Scheidt, Ex. C.

- 17 -

to hear and determine the matter under 28 U.S.C. § 157(b)(1).
Confirmation of the Modified Plan, and the Objection brought
pursuant to Fed. R. Bankr. P. 3020(b)(1), constitute a core
proceeding under 28 U.S.C. § 157(b)(2)(L).

A.   PLAN CONFIRMATION STANDARDS

The bankruptcy court has an affirmative duty to ensure that
all the requirements for confirmation under § 1129 have been
satisfied.   In re Ambanc La Mesa Ltd. P'shp, 115 F.3d 650, 653
(9th Cir. 1997) (citing In re L & J Anaheim Assoc., 995 F.2d 940,
942 (9th Cir. 1993)).   The plan proponent must demonstrate to the
bankruptcy court by a preponderance of the evidence that the plan
meets all the requirements for consensual confirmation, or if the
only condition not satisfied is the eighth requirement, §
1129(a)(8), the plan satisfies the requirements of § 1129(b)(1).
Id.

Section 1129(a)(8) provides that "[w]ith respect to each
impaired class of claims or interests–(A) such class has accepted
the plan; or (B) such class is not impaired under the plan."
Here, this eighth requirement under § 1129(a) is not satisfied
because Class 2, an impaired class, did not accept the Modified
Plan.   Notwithstanding that § 1129(a)(8) is not met, a plan may
be "crammed down" over the objection of any dissenting class of
claims or interests if all other applicable requirements under §
1129(a) are met, and the additional requirements for cram-down --
that the plan "does not discriminate unfairly" against and "is
fair and equitable" to any impaired class that has not accepted
the plan -- are satisfied.   See § 1129(b)(1).

In essence, there are two requirements relevant to the

1  instant case, for which the Plan Proponents carry the burden: the

2  feasibility requirement of § 1129(a)(11) and the fair and

3  equitable treatment requirement of § 1129(b)(2)(A).

4  Particularly, this contest boils down to two discrete issues:

5  (1) whether the Modified Plan is feasible, considering the

6  Projections, the Debtor's significant debt service obligations to

7  Class 2, and its ability to make the balloon payment; and

8  (2) whether the Modified Plan is fair and equitable to Class 2,

9  given the proposed interest rate of 5.2% per annum.

10  B.  FEASIBILITY UNDER § 1129(a)(11)

11       The linchpin for any plan-confirmation proceeding is a

12  finding that the proposed plan is feasible.  Under § 1129(a)(11),

13  the plan proponent must demonstrate that "[c]onfirmation of the

14  plan is not likely to be followed by the liquidation, or the need

15  for further financial reorganization, of the debtor[,] . . .

16  unless such liquidation or reorganization is proposed in the

17  plan."  This so-called "feasibility" requirement[28] is distilled

18  into a simple proposition: the plan proponent must show that the

19  plan "has a reasonable probability of success."  Acequia, Inc. v.

20  Clinton (In re Acequia, Inc.), 787 F.2d 1352, 1364 (9th Cir.

21  1986).

22       An additional gloss on this requirement is that it is meant

23  "to prevent confirmation of visionary schemes[,] which promise

24  creditors and equity security holders more under a proposed plan

25  than the debtor can possibly attain after confirmation."  Pizza

26

27       28.  See S. Rep. No. 95-989, 95th Cong., 2d sess. 128 (1978)
    ("Paragraph (11) requires a determination regarding feasibility
28  of the plan.").

- 19 -

1 | of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.),
2 | 761 F.2d 1374, 1382 (9th Cir. 1985) (citing 5 Collier on
3 | Bankruptcy ¶ 1129.02[11] at 1129-34 (15th ed. 1984)).

4 |     In evaluating the feasibility of a plan, bankruptcy courts
5 | consider several, non-exclusive factors: (1) the adequacy of the
6 | capital structure; (2) the earning power of the business; (3)
7 | economic conditions; (4) the ability of management; (5) the
8 | probability of the continuation of the same management; and (6)
9 | any other related matter which determines the prospects of a
10 | sufficiently successful operation to enable performance of the
11 | provisions of the plan.  Wiersma v. O.H. Kruse Grain & Milling
12 | (In re Wiersma), 324 B.R. 92, 113 (B.A.P. 9th Cir. 2005)
13 | (citation omitted) (internal quotation marks omitted), rev'd on
14 | other grounds, 483 F.3d 933 (9th Cir. 2007).  Moreover, "a plan
15 | that proposes a final balloon payment requires credible evidence
16 | that obtaining future financing is reasonably likely."  Id.
17 | (citation omitted).

18 |     For the reasons that follow, the Plan Proponents have failed
19 | to demonstrate that the Modified Plan is feasible.  The
20 | Projections, and testimony of Mr. Smith and Mr. Scheidt,
21 | underscore that the Modified Plan does not have a reasonable
22 | probability of success.  The capital structure reflected in the
23 | Projections demonstrates that the Debtor will suffer operating
24 | losses early in its reorganized life.  However, under the best-
25 | case scenario offered by the Plan Proponents, at 85% occupancy,
26 | the earning power of the Debtor is estimated to be $61,200 in
27 | monthly income.  At the Confirmation Hearing, however, Mr. Smith
28 | testified that the Debtor has had the good fortune of already

achieving an 84% occupancy rate, but that even at that occupancy
rate, the Debtor's income increases only to $49,000 per month.
This testimony severely undercuts the credibility of the
Projections and that the Debtor can generate $61,200 per month at
an 85% occupancy rate.  This significant defect in the
Projections casts doubt on the forecast in general.

Even if the Debtor is in the ballpark of generating $50,000
on a monthly basis, the Debtor will experience significant
operating losses.  This assures that the Debtor will have to
resort to its contingencies to fund a shortfall to Class 2.  The
Plan Proponents make bare assertions that the partnership will
make additional capital calls; that Mr. Brown or certain members
of his family will inject funds or guarantee the payments to
Class 2; that the partnership will sell additional equity
interests to raise funds; or that the property and business will
be sold to retire the debt.  Because a shortfall is almost a
certainty, the Plan Proponents should have submitted evidence to
support the viability of these back-up options.  No such evidence
was submitted.

The feasibility of the Modified Plan hinges on the balloon
payment to the Bank through the refinance or sale of the El
Dorado Hills Property, yet the Plan Proponents have not submitted
any evidence to support a finding that such a refinance or sale
is reasonably likely.  Notably, at the Confirmation Hearing, the
Plan Proponents acknowledged that Mr. Brown's commitment was
limited to a personal guarantee of only the monthly payments to
Class 2.  "[A] plan that proposes a final balloon payment
requires credible evidence that obtaining future financing is

1   reasonably likely." <u>O.H. Kruse Grain & Milling</u>, 324 B.R. at 113.

2   Here, with a substantial balloon payment being the linchpin under

3   the Modified Plan, the court has no credible evidence before it

4   that the Debtor is reasonably likely to obtain future financing.

5       Considering the inadequacy of the Debtor's capital

6   structure, overstated earning power, and uncertain contingencies

7   for repayment, the court concludes that the Modified Plan will

8   likely be followed by liquidation or the need for further

9   reorganization within the meaning of § 1129(a)(11).

10  C.  FAIR AND EQUITABLE TREATMENT UNDER § 1129(b)(2)(A)(i)

11      Although the Plan Proponents have failed to satisfy the

12  critical requirement of feasibility, the court will also

13  highlight how the Modified Plan falls short of meeting the fair

14  and equitable treatment mandate of § 1129(b)(1).  Section

15  1129(b)(2) provides a list of requirements for a plan to be fair

16  and equitable to an impaired class of claims or interests that

17  has not accepted the plan.  Because the only impaired class that

18  has not accepted the Modified Plan is Class 2 -- a class

19  associated with a secured claim -- the only relevant provision

20  from that list is § 1129(b)(2)(A).[29]

21      Paragraph (A) itself contains a menu of three different

22  alternatives, written in the disjunctive, that would satisfy the

23  requirements for fair and equitable treatment concerning a

24  dissenting class of secured claims.  The applicable provision in

25  this case is § 1129(b)(2)(A)(i), which governs fair and equitable

26

27      29.  As stated earlier, the Objection addressed the
    possibility of an absolute priority problem under § 1129(b)(2)(B)
28  if Class 5 voted to reject the Modified Plan.  Since Class 5
    voted to accept the Modified Plan, this argument is moot.

treatment of a dissenting class of secured claims when a plan
proposes that the holder of a secured claim retain the liens
securing such claim and receive deferred cash payments.  Here,
the Modified Plan proposes that the Bank retain its lien on the
El Dorado Hills Property and receive cash payments over three
years, culminating in a balloon payment on or before the 36th
month.

The Bank takes issue with the second prong of §
1129(b)(2)(A)(i), arguing that it is not satisfied because the
interest rate at which the Bank's claim will accrue post-
confirmation is too low.  Under a deferred payment scheme, a
secured creditor must receive deferred cash payments on account
of its claim "totaling at least the allowed amount of such claim,
of a value, as of the effective date of the plan, of at least the
value of such holder's interest in the estate's interest in such
property."  §  1129(b)(2)(A)(i)(II).

"Restated in basic terms, 'present value' is the mirror
image of 'interest rate,' and the plan cannot impose
uncompensated risk upon the bank by paying too low an interest
rate under the plan."  In re North Valley Mall, LLC, 432 B.R.
825, 830 (Bankr. C.D. Cal. 2010).  The present value of deferred
cash payments must "consist of an appropriate interest rate and
an amortization of the principal[,] which constitutes the secured
claim."  Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In
re Briscoe Enters.), 994 F.2d 1160, 1169 (5th Cir. 1993).

In this case, the total payments to the Bank must add up to
$6,144,284.37, the allowed amount of the Bank's claim; also, the
present value of the payments, as of the effective date of the

- 23 -

Modified Plan, must add up to $5,940,000, the value of the Bank's collateral.  Under the Modified Plan, Class 2 will receive monthly payments of $33,738.93 with interest accruing at 5.2% per annum, amortized over 30 years.  As detailed below, the proposed rate of interest is not fair and equitable to Class 2.

The court will first address the Supreme Court's jurisprudence in this area.  In <u>Till v. SCS Credit Corp.</u>, 541 U.S. 465, 479-80 (2004), the Supreme Court adopted the "formula approach" in the context of *a chapter 13 case*.  Under the formula approach, the baseline is the national prime rate.  Next, the approach requires that the bankruptcy court add a risk premium to account for the risks inherent in the transaction.  <u>Till</u> notes that "[t]he appropriate size of [the] risk adjustment depends . . . on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan."  <u>Id.</u> at 479.  Determining the factors relevant to the adjustment is left to the expertise of the bankruptcy court, but "the proper scale for the risk adjustment" must be enough "to compensate the creditor for its risk but not so high as to doom the plan."  <u>Id.</u> 479-80.  Thus, feasibility is closely intertwined with choosing a fair and equitable interest rate.

<u>Till</u> was a chapter 13 case where the collateral at issue was a truck, whereas the instant case is a business chapter 11 case where the collateral at issue is commercial real property.  Those distinguishing points aside, <u>Till</u>'s applicability to the chapter 11 context is the subject of debate.  <u>See, e.g.</u>, <u>In re American HomePatient, Inc.</u>, 420 F.3d 559, 566-67 (6th Cir. 2005) (<u>Till</u>'s

footnote 14 "suggests that a formula approach like the one
adopted by the plurality is not required in the [c]hapter 11
context."), <u>reh'g and reh'g en banc denied</u>.  In footnote 14, <u>Till</u>
offered the following guidance on selecting an appropriate
interest rate in a chapter 11 case: "when picking a cram down
rate in a [c]hapter 11 case, it might make sense to ask what rate
an efficient market would produce."  <u>Till</u>, 541 U.S. at 476 n.14.
Since there is generally no market for 100%-LTV cram-down loans,
a mixture of rates from multiple financing products available in
the market is a good approximation of what the market would yield
for such a loan.

The Bank cites <u>North Valley Mall</u>, 432 B.R. at 832 for the
proposition that the best approach for determining the
appropriate interest rate in the chapter 11 context is the
"blended rate" approach used in <u>Pacific First Bank v. Boulders on
the River, Inc. (In re Boulders on the River, Inc.)</u>, 164 B.R. 99,
105 (B.A.P. 9th Cir. 1994).  The court concludes that this
approach is indeed the correct approach for fashioning a proper
interest rate when there is no market for 100%-LTV cram-down
loans.  The court in <u>Boulders</u> blended two rates from two
different tranches: one from a 70%-LTV loan and the other from
mezzanine financing.  <u>Boulders</u>, 164 B.R. at 105.  Thus, the rate
associated with the highest-LTV-ratio loan the market will bear
should be blended with the rate or rates associated with one or
more hypothetical tranches.  "[T]o the extent that the loan
exceeds [the maximum LTV ratio the market can sustain], the
lender is exposed to additional risk and should therefore be
compensated by a corresponding increase in the interest rate."

1  <u>Id.</u>

2       The Bank's expert, Mr. Scheidt, clearly demonstrated that
3  the proposed cram-down interest rate of 5.2% per annum is below
4  the fair and equitable threshold.  Mr. Scheidt premised his
5  analysis on the Plan Proponents's best-case scenario, yet arrived
6  at a figure of 8.4% per annum.  For the following reasons, the
7  court puts more weight and emphasis on Mr. Scheidt's testimony
8  than on Mr. Hayhurst's.  Although both witnesses qualify as
9  experts, Mr. Scheidt is more qualified and demonstrated more
10 expertise in the self-storage industry.  Mr. Scheidt has
11 established a track record with investments in self-storage
12 facilities, whereas Mr. Hayhurst's experience is premised on
13 commercial lending in general.  Mr. Hayhurst's declaration makes
14 only the most conclusory statements about small-business
15 commercial-loan products, and parrots underwriting standards and
16 prevailing market dynamics without any application to the case at
17 hand.  Because Mr. Hayhurst's declaration makes conclusions
18 without support, and fails to apply applicable underwriting
19 standards to the facts of this case, the court finds his opinion
20 that the Debtor could refinance at a current-market interest rate
21 between 5.03% and 5.36% to be without support.

22      On the other hand, Mr. Scheidt testified that the Debtor
23 could acquire at most an 85%-LTV loan, *assuming that the Debtor*
24 *is a qualified borrower*.  Whereas Mr. Hayhurst's testimony is
25 analytically deficient, Mr. Scheidt's analysis entails a
26 thoughtful and reasoned analysis: according to Mr. Scheidt, there
27 is a need for a combination of first mortgage debt; mezzanine
28 financing; and new equity, and the rates for only the debt

portion (first and mezzanine), when blended, yield an interest rate of 8.4% per annum.

The court does not need to find that Mr. Scheidt's specific interest rate is the correct one, but notes that his analysis is the sort of analytical exercise in which the Plan Proponents should have engaged to meet their burden.  The court, however, does find that the Debtor -- if it is deemed to be a qualified borrower -- should acquire a first mortgage up to 85%-LTV, and then, must account for one or more tranches to shore up the 15% gap.  Under a blended rate approach, any additional tranches would necessarily entail relatively higher rates of interest to compensate the lender for exposure to additional risk. Therefore, based on the reasons stated above, the 5.2% per annum cram-down interest rate offered by the Plan Proponents is not fair and equitable to Class 2 under § 1129(b)(2)(A)(I).

C.  RELIEF FROM THE AUTOMATIC STAY

On June 15, 2011, the Bank filed Third Motion for Relief From the Automatic Stay, Docket Control No. FDS-6 (the "Relief From Stay Motion").  The court continued the Relief From Stay Motion to allow the Debtor to proceed with confirmation of a plan.  As stated on the record, the court's intention was to grant the Relief From Stay Motion in the event that the Modified Plan was not confirmed, or deny it in the event that it was.

Since the Modified Plan will not be confirmed, the court will grant the Relief From Stay Motion.  The court finds that the Debtor does not have any equity in the El Dorado Hills Property, and because the Debtor has failed to demonstrate that there is a reasonable probability of success that the Modified Plan will be

1  confirmed, the El Dorado Hills Property is not necessary to an

2  effective reorganization.  See § 362(d)(2).

## III. CONCLUSION

4  Because the Modified Plan is not feasible under §

5  1129(a)(11) and the proposed interest rate for the Class 2 claim

6  is not fair and equitable under § 1129(b)(2)(A)(i), the Modified

7  Plan will not be confirmed.  Also, because the Modified Plan will

8  not be confirmed, the Relief From Stay Motion will be granted.

9  The court will issue an appropriate order.

11  Dated: April 12, 2012

ROBERT S. BARDWIL
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

CERTIFICATE OF MAILING

The undersigned deputy clerk in the office of the United
States Bankruptcy Court for the Eastern District of California
hereby certifies that a copy of the document to which this
certificate is attached was mailed today to the following
entities at the addresses shown below or on the attached list.

C. Anthony Hughes
1395 Garden Highway, Ste.
150
Sacramento CA 95833

Jane K. Springwater
33 New Montgomery Street,
Suite 290
San Francisco CA 94105

DATED: 4/13/12

By: _____
Deputy Clerk

R. Lopez

EDC 3-070 (Rev. 6/28/10)