(38)

FILED

NOV - 6 2012

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

*FOR PUBLICATION*

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: ) | Case No. 10-36676-D-7 |
| ) | |
| SUNDANCE SELF STORAGE- ) | |
| EL DORADO LP, ) | |
| ) | Date:  October 10, 2012 |
| Debtors. ) | Time:  10:00 a.m. |
| ) | Dept:  D |
| ) | |
| ) | |

C. Anthony Hughes, Sacramento, California, former counsel for
Chapter 11 Debtor-in-Possession, appearing in propria persona

Jason Blumberg, United States Department of Justice, Sacramento,
California, for Acting United States Trustee, Region 17, August
B. Landis

### MEMORANDUM DECISION

On July 12, 2012, this court issued an order to show cause
directing the debtor's attorney, C. Anthony Hughes ("Counsel"),[1]
to show cause, if any he had, why the court should not reconsider
the amount approved under an earlier fee award in his favor and
why he should not be sanctioned for violating Fed. R. Bankr. P.
9011(b) (the "OSC").[2] Counsel has now filed four declarations
addressing the court's concerns raised in the OSC and an
additional concern that came to light following the issuance of

---

1.  Counsel is not to be confused with Gregory J. Hughes and
Christopher D. Hughes, of Hughes Law Corporation, counsel for the
chapter 7 trustee in this case.

2.  Unless otherwise indicated, all Code, chapter, and
section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-
1532.  All rule references are to the Federal Rules of Bankruptcy
Procedure, Rules 1001-9037.

1 the OSC.   The OSC hearing was concluded on October 10, 2012.

2      For the following reasons, the court will issue an order
3 disallowing all compensation previously approved and requiring
4 Counsel to disgorge to the estate of the debtor, Sundance Self
5 Storage-El Dorado LP ("Sundance"), all monies Counsel received as
6 compensation for services and reimbursement of expenses in and in
7 connection with this case and Sundance's earlier case, discussed
8 below.

9                           **I.   BACKGROUND**

10      This case presents a graphic illustration of the policies
11 underlying the rules that professionals employed in chapter 11
12 cases must make full and complete disclosure of their connections
13 with the debtor and other parties-in-interest, must not hold or
14 represent an interest adverse to the estate, and must be
15 "disinterested."   This decision is meant to underscore the need
16 for professionals employed by a bankruptcy estate to make full
17 and candid disclosure of all connections, both when applying for
18 approval of their employment and during the pendency of the case.
19 This duty to disclose must be taken seriously -- if a
20 professional fails to do so, he or she risks disallowance of all
21 compensation.

22      Here, Counsel's omissions were so obvious, there can be only
23 two explanations.   Either Counsel actively attempted to conceal
24 his disqualifying connections, or, more likely, Counsel's
25 declarations in support of his applications to employ and in
26 response to the OSC were so perfunctory as to render them
27 meaningless.   Either scenario is troubling; either scenario
28 warrants disallowance of all fees in this case.

- 2 -

## A.  The Transfer of Sundance's Principal Asset

In May 2012, after its two-year attempt to obtain confirmation of a plan of reorganization came to an unsuccessful end, Sundance faced foreclosure on virtually its only asset, a self-storage facility in El Dorado Hills, California (the "Property"), by U.S. Bank (the "Bank"), and a motion by the United States Trustee (the "U.S. Trustee") to dismiss or convert this case.[3]  Counsel filed his final fee application and set it for hearing on May 30, 2012, the same day the U.S. Trustee's motion was set for hearing.

On May 24, 2012, after Sundance's attempt to stay the foreclosure in state court had failed, and just six days before the hearings on the U.S. Trustee's motion and Counsel's fee application, Howard Brown ("Brown"), on behalf of Sundance, signed a grant deed transferring the Property to West Coast Real Estate & Mortgage, Inc. ("West Coast"), a corporation wholly owned by Don Smith ("Smith").[4]  On May 29, 2012, the day before the hearings, the grant deed was recorded.  Six days later, on June 4, 2012, West Coast filed a chapter 11 petition in this court; its bankruptcy counsel is Mohammad Mokarram ("Mokarram"). The same day, the court issued an order granting the U.S.

---

3.  The court may refer to this case as the "Sundance case" to distinguish it from the West Coast case or the Smith case, discussed below.

4.  Brown is the president and sole owner of Peninsula Capital Group, Inc., the general partner of Sundance.  Smith was, from the commencement of this case to its conversion to chapter 7, Sundance's "manager of operations."  Both had participated heavily in the Sundance case; both were aware that plan confirmation had been denied, that the court had lifted the automatic stay in favor of the Bank, and that the U.S. Trustee was seeking dismissal or conversion of the case.

Trustee's motion and converting the Sundance case to a case under chapter 7. On June 6, 2012, the court issued an order approving Counsel's fee application in part, awarding fees of $57,270 and costs of $4,631.

Smith has admitted he initiated the transfer of the Property from Sundance to West Coast. The transfer was made without the court's approval or knowledge and without notice to the U.S. Trustee or any of the other parties in the Sundance case. The transfer of the Property came to the court's attention in mid-June, when the Bank sought relief from the automatic stay in the West Coast case.

**B.  Issuance of the OSC and Counsel's Declarations in Response**

The court issued the OSC out of a concern that Counsel may have played a role in the unauthorized transfer of the Property from Sundance to West Coast, a transfer that the court had by then concluded was made in bad faith. As noted in the OSC, the circumstances suggested Counsel may have known of the transfer and the intention of Smith, Brown, or both to put West Coast into chapter 11. In the OSC, the court quoted the Bankruptcy Code's dual requirement that bankruptcy professionals must not hold or represent an interest adverse to the estate and must be disinterested, emphasizing that these requirements continued to apply to Counsel as counsel for the debtor-in-possession up to the date the case was converted to chapter 7. The court also impressed upon Counsel the policies underlying these requirements:  ensuring undivided loyalty to the bankruptcy estate and preserving public confidence in the fairness of the bankruptcy system.

- 4 -

1   Thus, the OSC required Counsel to file a declaration

2   detailing the knowledge and involvement of Counsel, or anyone in

3   his office, of and in the transfer of the Property from Sundance

4   to West Coast and the filing of the West Coast case.[5]

5   **1.  The first declaration**

6   Counsel's first declaration in response to the OSC was

7   equivocal.  Counsel stated that at the time of the hearing on the

8   motion to dismiss or convert the case, on May 30, 2012, "[he] did

9   not know that a deed was created to transfer the property and

10  [he] did not know it had been recorded. . . .  [He] was told

11  about the transfer by [Smith] sometime after the hearing . . .

12  ."[6]  Counsel acknowledged that he "recommended [Smith] seek legal

13  advice from Mikalah Liviakis, Gerald Glazer, Mo Mokarram, or any

14  other chapter 11 Attorney he could find,"[7] but stated he did not

15  have any meetings or discussions with Smith, Brown, or Mokarram

16  on the subject of the grant deed until after it was recorded.

17  Counsel did not indicate whether he asked Smith why he needed

18  advice from a chapter 11 attorney other than Counsel.

19  The U.S. Trustee filed a response to Counsel's first

20  declaration, pointing out that Counsel had failed to address

21  whether he was aware, prior to the transfer, that Smith and Brown

22  were contemplating transferring the Property.  The U.S. Trustee

23  noted that the 41-day gap from entry of the order lifting the

24  _____

25   5.  See Order to Show Case, filed July 12, 2012, Dkt. No.
    494.

26   6.  Declaration of C. Anthony Hughes in Response to Order to
27  Show Cause, filed July 23, 2012, Dkt. No. 499 ("Counsel's Decl.
    #1"), 2:2-5.

28   7.  Id. at 2:25-28.

- 5 -

1 stay to the date of the transfer suggested Counsel may have
2 become aware of their plan to transfer the Property.

3    **2.    The second declaration**

4    In response to the U.S. Trustee's concerns, Counsel filed a
5 supplemental declaration in which he simply denied any awareness
6 that Smith, Brown, or anyone else was contemplating the transfer
7 before it occurred.  As to the U.S. Trustee's suggestion that
8 Counsel abdicated control of the Sundance case to others, Counsel
9 stated he took a "step back in the case," and in doing so, "saved
10 the estate a huge amount of money . . . ."[8]

11    Counsel testified that when he accepted the Sundance case,
12 he "did not have all the procedures that [he has] in place now
13 such as having clients sign letters of understanding which
14 outline the responsibilities of the Debtor in Possession."[9]  He
15 stated it was, however, his practice at that time to "instill in
16 the Debtor's representatives that a motion is required for any
17 action outside the ordinary course of business.  This was

18

19    8.    Supplemental Declaration of C. Anthony Hughes in
20 Response to United States Trustee Response on Order to Show
Cause, filed August 8, 2012, Dkt. No. 505 ("Counsel's Decl. #2"),
21 2:18, 2:21-22.

22    As an Attorney in private practice, I have to balance
    many forces including the likelihood I will get paid .
23    . . , the client's commands and desires, the duty to
    the court and to my profession.  In this instance, the
24    Bank had obtained relief from stay on the only asset of
    value in the case.  There was going to be no estate
25    left to administer.  I was keeping my time on the case
    to a bare minimum. . . .  I didn't imagine any time I
26    would spend on the case after relief from stay was
    granted would be of any benefit to the estate.
27
    Id. at 4:20-5:4.
28
    9.    Id. at 3:23-26.

instructed early on in the case and [he] had no reason to believe
there was any misunderstanding."[10]

Counsel added, however, that at some point, he "recommended
[Smith] seek other counsel, but [he] did not recommend other
counsel for the purpose of only filing a chapter 11 case."[11]  This
indicates Counsel knew a chapter 11 filing was one of the avenues
being contemplated; he must have known such a filing was intended
in some way to protect the Property from the Bank's foreclosure.
Yet he did not inquire what entity would be doing the filing or
what that entity's relationship to the Property would be.

Instead, "[he] recommended Mr. Smith seek advice from other
counsel for all purposes because Mr. Smith had numerous types of
lawsuits and motions he wanted filed and there was no money to
pay administrative expenses and [Counsel's] recommendation was
for [a] short sale or chapter 7 conversion."[12]  "[T]o an extent, I
did know that Mr. Smith was looking into many other approaches
and I did not inquire.  So to that extent I take responsibility
for not taking the time or asking the questions."[13]

In this second declaration, Counsel included one more
"additional disclosure."  He stated that Smith had told him Brown
would cover his attorney's fees.  He "may have disclosed" this at
the hearing on his fee application.  "I definitely disclosed it
to the Attorney for [the Bank] because she had the concern that

10.  Id. at 3:26-7:2.

11.  Id. at 4:7-9 (emphasis added).

12.  Id. at 4:9-13.

13.  Id. at 5:5-7.

cash collateral would be used and I explained that if any money were to be paid to me it would come from the Debtor's principals."[14]  At no time prior to the filing of this declaration had Counsel disclosed to the court that a guarantee by Brown was or might be a part of his fee arrangement for the Sundance case.

### 3.  The third declaration

In response to the court's interim ruling on the OSC,[15] Counsel filed a third declaration in which he maintained he "did not have any specific knowledge that certain individuals and entities were contemplating the transfer of the [Property] prior to the conversion of this case to chapter 7."[16]  Nevertheless, Counsel now confirmed that he knew a new bankruptcy filing was being considered, and revealed for the first time the possibility that Sundance might have a co-owner in the Property:

> Don Smith did mention a few things . . . .  One was that some other person (I don't recall if the other person was the 2nd mortgage holders or Howard Brown, but it was someone along those lines) owned some percentage of the property which I also recalled from reading the title report earlier in the case. . . . Don Smith didn't state that he was going to cause a bankruptcy filing based on the title report showing some other partial owner of the property but I did sense that he saw a possibility of the other party who owns the property filing a bankruptcy case.  The other owner of the property (if any) would not have needed a transfer of the property to file because they were

---

14.  <u>Id.</u> at 5:14-18.

15.  <u>See</u> civil minutes for the August 15, 2012 hearing date, Dkt. No. 507.

16.  Supplemental Declaration of C. Anthony Hughes in Response to Order to Show Cause, filed August 22, 2012, Dkt. No. 509 ("Counsel's Decl. #3"), 2:6-9.

1    already allegedly on title.[17] [18]

2    What Counsel failed to disclose, in his third declaration or
3 at any other time, was that during virtually the entire two years
4 he represented Sundance as debtor-in-possession in this case, he
5 was also representing Smith in Smith's personal chapter 13 case,
6 Case No. 10-38537-B-13, in another department in this court.
7 Instead, Counsel independently determined that his representation
8 of Smith in Smith's chapter 13 case was not a connection he
9 needed to disclose in the Sundance case.[19]

10    The court unearthed the fact of Counsel's representation of
11 Smith on its own immediately before the August 29, 2012 continued
12 hearing on the OSC.  At the hearing, the court shared its
13 discovery with Counsel, highlighting the severity of his failure
14 to make the appropriate disclosure.  The court continued the

15

16

17    17.  Id. at 2:9-21.

18.  This was the first time the possibility that Sundance
18 had a co-owner was ever mentioned in the case, although it is
    next to impossible to see how creditors and equity security
19 holders could have made an informed decision about the plan of
    reorganization without knowing the Property might be co-owned by
20 Sundance and some other person or entity.

21    19.  Thus, in two declarations in support of his employment
    in the Sundance case, both filed after he had filed Smith's
22 chapter 13 petition, Counsel stated the following:

23    I am not an equity security holder or an insider, and
       do not have any connection with any insider of the
24     Debtor or any insider of an insider of the Debtor.  [¶]
       I do not hold or represent any interest adverse to the
25     Debtor or It [sic] estate, and I am a "disinterested
       person" as defined by Bankruptcy Code § 101(14).  Also,
26     to the best of my knowledge, . . . I have no prior
       connection with the Debtor, any creditors of the
27     Debtor, or any other party in interest in this case, or
       their respective attorneys or accountants . . . .
28
    Counsel's Employment Decls., 2:7-13.

                              - 9 -

hearing again, requiring Counsel to disclose the nature and
extent of all past and present connections between Counsel and
his law office with Smith and his accounting office.[20]

**4.  The fourth declaration**

In response to this new concern, Counsel began his fourth
declaration by stating unequivocally, "I have no connection with
Don Smith's accounting office.  I have no professional
arrangements with Don Smith nor [sic] his accounting office."[21]
Counsel added, however, that (1) Smith may have filed for an
extension on one of Counsel's tax returns, (2) Smith may have
filed one of Counsel's business's or corporation's tax returns,
and (3) Smith may have prepared a tax return for one of Counsel's
employees.  In all three cases, Counsel was not sure.  As with
Counsel's representation of Smith in Smith's chapter 13 case, at
no time prior to the filing of his fourth declaration did Counsel
disclose any of these possible tax-related connections.

Indeed, Counsel appears to have understood his connections
with Smith, both as Smith's attorney and possibly as a tax client
of Smith's, to be innocuous circumstances not worthy of
disclosure:

> I didn't see any connection with Don as being any
> conflict because Don was not an officer, director of
> the Debtor and was not the Debtor and was not the
> decision making person for the Debtor.  I'm not saying
> that I disagree that the court should be concerned; Im
> [sic] just saying that at the time I didn't think that
> was a "connection with the Debtor" and therefor had any
> relevance to the case.  From a practical view, I

---

20.  <u>See</u> Order, filed August 30, 2012, Dkt. No. 512.

21.  Second Supplemental Declaration of C. Anthony Hughes in
Response to Order to Show Cause, filed September 12, 2012, Dkt.
No. 517 ("Counsel's Decl. #4"), 2:8-10.

> 1  understood the "prior connection" disclosure to be to
> 2  disqualify a professional to protect against creditors
>    having influence on that professional or to prevent the
> 3  professional for [sic] having motivation for their self
>    rather than their fiduciary responsibility to the
> 4  client.  I didn't see any of those [as] potential
>    issues or connections.[22]

5      As will be seen, Smith was the primary representative of the

6 debtor from the beginning -- he was the very face of the debtor.

7 It is difficult to see how any knowledgeable bankruptcy attorney

8 could view connections as significant as representing Smith

9 personally and having Smith prepare Counsel's or Counsel's

10 corporation's tax returns as so insignificant that they did not

11 warrant disclosure.  It is not up to the bankruptcy professional

12 to weigh the significance of a particular connection; as

13 discussed below, his role is to disclose it fully.

14     Finally, at no time did Counsel disclose to the court in

15 this case that he had represented Sundance in an earlier case,

16 Case No. 10-34414-D-11 in this court,[23] and was, at the time the

17 present case was filed, still owed money by Sundance for his

18 services in that earlier case.  Sundance's earlier case was

19 disclosed in Counsel's interim fee application in this case;

20 Counsel did not, however, disclose that he had been Sundance's

21 attorney in that case or that he was still owed money for his

22 services in that case.  In fact, in two declarations in support

23 of his employment in the present case, Counsel stated, "I do not

24 have a pre-petition claim against the Debtor or the Bankruptcy

---

22.  Id. at 3:27-4:9.

23.  The petition was filed May 31, 2010, and the case was
dismissed June 21, 2010 for failure to file required schedules
and statements.

1  estate. . . .  Also, to the best of my knowledge, . . . I have no
2  prior connection with the Debtor . . . ."[24]

3  **C.  Don Smith's Role in This Case**

4      The petition in this case was signed by Smith as the
5  debtor's "Manager of Operations."  Smith signed all the debtor's
6  schedules, statements, and lists filed in the case, original and
7  amended.  According to the debtor's initial status report, Smith
8  had been given authority to act as manager of operations "and
9  [was] working on site as well as assisting in tasks necessary for
10  reorganization."[25]  The report also stated that Smith had been
11  hired to "oversee reorganization of the business, increase
12  income, decrease expenses, and play a hands on role in the day to
13  day business activities"; that Smith "project[ed] [a] steady
14  increase in income for the coming months"; and that Smith
15  "plan[ned] on investigating a potential $180,000 debt that may be
16  owed to the business that could be used to help reorganize, and
17  to apply for a reassessment to bring the property taxes down."[26]
18  In short, it was plainly intended, and Counsel understood, that
19  Smith would play a central role in the debtor's reorganization.

20      Smith's conduct throughout the case was emblematic of
21  managerial control.  Smith was the only representative of the
22  debtor to appear at the meeting of creditors.  For the first ten

23

24
25      24.  Declarations of C. Anthony Hughes in Support of
    Application of Debtor and Proposed Debtor in Possession to Employ
    C. Anthony Hughes as Bankruptcy [Attorney], filed August 3, 2010
26  and September 26, 2010, Dkt. Nos. 31 and 81 ("Counsel's
    Employment Decls."), 2:7, 2:10-12.
27
        25.  Status Report, filed July 9, 2010, Dkt. No. 11, 5:1-2.
28
        26.  Id. at 2:17-19, 2:21-22, 3:3-5.

months of the case, the bank statements for the debtor-in-possession account were mailed to the address from which Smith operated his tax and accounting practice, as well as several other businesses and investment enterprises, including West Coast.  Smith prepared and signed all the debtor's monthly operating reports; signed almost all the declarations filed by the debtor in the case, including the only declarations in support of its motions to use cash collateral, to assume unexpired leases, and to value real property collateral; and signed the debtor's primary declaration opposing the Bank's relief from stay motion.[27]

In that declaration, Smith testified that his duties included "day to day management of the employees, negotiations with suppliers and creditors, and marketing and pricing strategy"; that he assisted counsel with "compiling the statistical and financial information" in the plans and disclosure statements; and that he prepared the plan projections.[28]  Smith testified extensively and in great detail

---

27.  By contrast, the only declarations signed by any other representative of the debtor were declarations of Brown, president of the debtor's corporate general partner, who signed (1) declarations in support of motions for permission to file his personal financial statements under seal, (2) declarations in opposition to the Bank's objections to Brown's and his sister's claims against the estate, and (3) a single declaration in opposition to a relief from stay motion in which Brown testified only to his own intention to personally guarantee the debtor's plan payments to the Bank.  Brown did not sign a declaration in support of plan confirmation and did not appear at the plan confirmation hearing.

28.  Declaration of Don Smith in Support of Opposition to Supplemental Brief in Support of Third Motion for Relief from the Automatic Stay, filed September 8, 2011, Dkt. No. 209, 2:14-15, 2:22-24, 3:8.

about his projections, alleged improvements in the debtor's
performance, maintenance and repairs, and prospective new
financing.

Smith signed the debtor's plans of reorganization and
disclosure statements filed June 10, August 19, and October 14,
2011 (the latter re-filed as modified on November 16, 2011) as
"Authorized signer for Howard A. Brown, III, President of
Peninsula Capital Group, Inc., General Partner of Debtor."

The debtor's various disclosure statements described Smith's
role in the case as follows:

> Don Smith, a professional real estate investor, real
> estate broker, property manager, and income tax
> professional [. . .] has co-managed the on-site
> operations and staff, overseen monthly budgets, managed
> communications with the [debtor's] legal counsel,
> communications with the bank and the limited
> partnership members.[29]

Aside from an expert witness's declaration regarding
commercial lending rates, the only declaration Sundance filed in
support of plan confirmation was that of Smith, who testified
that, since the commencement of the case, he had been "involved
on a daily basis with the marketing, maintenance, income and
expense management, and all of the other related duties necessary
to effectuate a successful business operation."[30]  He also
testified about the debtor's financial performance, his opinion
of the plan's feasibility, and the debtor's specific intentions
for satisfying the secured debt post-confirmation.

---

29.  Sundance Self-Storage-El Dorado LP's Disclosure
Statement, filed August 19, 2011, Dkt. No. 196, at 4.

30.  Declaration of Don Smith in Support of Confirmation of
Plan of Reorganization, filed January 17, 2012, Dkt. No. 348,
2:21-23.

- 14 -

1    In short, Smith was without question the representative of

2 the debtor who played the most active and important role in its

3 reorganization effort.  From the outset, he was involved in and

4 essentially in charge of virtually every facet of the chapter 11

5 administrative process.  While Brown may have made certain

6 decisions behind the scenes, Smith made the day-to-day ones and

7 controlled all aspects of the business and bankruptcy processes.

8 In the end, Smith was sufficiently in control of the debtor to

9 arrange for the transfer of the Property to a corporation wholly

10 owned by him.  And as will be seen, in light of his personal

11 circumstances, he had a powerful motivation to do so.

12                          **II.   ANALYSIS**

13    After accounting for the true nature of the relationships in

14 this case, the court finds that Counsel held and represented

15 interests adverse to the estate and was not a "disinterested

16 person."  Therefore, Counsel's employment by Sundance should not

17 have been approved.  Further, Counsel failed to disclose his

18 connections with Sundance, with Smith, and with Brown.  For both

19 reasons, the court concludes that all compensation and

20 reimbursement of expenses for services provided by Counsel to

21 Sundance before the case was commenced and while Sundance was a

22 debtor-in-possession should be disallowed and all monies received

23 by him for those services and expenses and those he provided and

24 incurred in connection with Sundance's earlier chapter 11 case

25 should be disgorged.

26 **A.   Jurisdiction and Authority**

27    This court has original and exclusive jurisdiction over the

28 employment of counsel, their compensation, and their disclosure

                              - 15 -

obligations, pursuant to 28 U.S.C. § 1334(e)(2), and has the
authority to hear and determine this matter pursuant to 28 U.S.C.
§ 157(b)(1).  The matter is a core proceeding under 28 U.S.C. §
157(b)(2)(A), as it concerns the administration of the estate.

**B.   The Dual Requirement of § 327(a)**

The Bankruptcy Code imposes significant restrictions on
professionals who are employed or compensated by a bankruptcy
estate so as to prevent professionals from representing interests
adverse to the estate.  The overarching goals of these
restrictions are to ensure undivided loyalty to the estate and to
preserve public confidence in the fairness of the bankruptcy
system.[31]

"[T]he [debtor-in-possession], with the court's approval,
may employ one or more attorneys . . . that do not hold or
represent an interest adverse to the estate, and that are
disinterested persons, to represent or assist the [debtor-in-
possession] in carrying out the [debtor-in-possession]'s duties
under this title."  §§ 327(a) and 1107(a); see also DeRonde v.
Shirley (In re Shirley), 134 B.R. 940, 943 (9th Cir. BAP 1992)
(holding that § 327 "is made equally applicable to a debtor in
possession as it is to a trustee by § 1107(a)").

The dual requirement that professionals representing
trustees and debtors-in-possession may not hold or represent "an
interest adverse to the estate" and must be "disinterested
persons" does not evaporate once the attorney's employment is

---

31.   See generally Anne E. Wells, Navigating Ethical
Minefields on the Bankruptcy Bandwagon, 31 Cal. Bankr. J. 767
(2011) (surveying ethical duties in bankruptcy cases).

approved.[32]   In fact, "the court may deny allowance of
compensation for services and reimbursement of expenses of a
professional person employed under section 327 . . . if, <u>at any
time during such professional person's employment</u> . . . , such
professional person is not a disinterested person, or represents
or holds an interest adverse to the interest of the estate . . .
." § 328(c) (emphasis added).   Essentially, § 328(c) operates as
a "penalty" for a professional's failure to avoid a disqualifying
conflict of interest.   <u>See</u> <u>Rome v. Braunstein</u>, 19 F.3d 54, 58
(1st Cir. 1994).

     The term "disinterested person" is defined in the Bankruptcy
Code to include one who is not a creditor and "does not have an
interest materially adverse to the interest of the estate or of
any class of creditors or equity security holders, by reason of
any direct or indirect relationship to, connection with, or
interest in, the debtor, or for any other reason." § 101(14)(A)
and (C).   A person who is disinterested "is one that can make
unbiased decisions, free from personal interest, in any matter
pertaining to the debtor's estate." <u>Shat v. Kistler (In re
Shat)</u>, BAP No. NV-09-1092-MoDK, 2009 WL 7809004, at *6 (9th Cir.
BAP Nov. 25, 2009) (citation omitted) (internal quotation marks
omitted).   The goal is to achieve undivided loyalty to a cause

----

     32.   "[T]he need for professional self-scrutiny and
avoidance of conflicts of interest does not end upon
appointment." <u>Rome v. Braunstein</u>, 19 F.3d 54, 57-58 (1st Cir.
1994).   This continuing duty to disclose preserves the integrity
of the bankruptcy system by ensuring that professionals working
for a trustee or debtor-in-possession do not have conflicts <u>at
any point</u> during their employment. <u>In re Granite Partners L.P.</u>,
219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998).

1  that is being administered for the benefit of many.[33]

2      The phrase to "hold or represent an interest adverse to the
3  estate" has been given meaning by case law.

4
5          A generally accepted definition of "adverse interest"
          is the (1) possession or assertion of an economic
          interest that would tend to lessen the value of the
6          bankruptcy estate; or (2) possession or assertion of an
          economic interest that would create either an actual or
7          potential dispute in which the estate is a rival
          claimant; or (3) possession of a predisposition under
8          circumstances that create a bias against the estate.

9  Dye v. Brown (In re AFI Holding, Inc.) (AFI Holding I), 355 B.R.
10  139, 148-49 (9th Cir. BAP 2006). See also In re Martin, 817 F.2d
11  175, 180 (1st Cir. 1987) (stating that a bankruptcy court must
12  inquire whether the connection created "either a meaningful
13  incentive to act contrary to the best interests of the estate and
14  its sundry creditors -- an incentive sufficient to place those
15  parties at more than acceptable risk -- or the reasonable
16  perception of one").  "To represent an adverse interest means to
17  serve as an attorney for an entity holding such an adverse
18  interest.  For the purposes of disinterestedness, a lawyer has an
19  interest materially adverse to the interest of the estate if the
20  lawyer either holds or represents such an interest." Tevis v.
21  Wilke, Fleury, Hoffelt, Gould & Birney, LLP (In re Tevis), 347
22  B.R. 679, 688 (9th Cir. BAP 2006) (citations omitted).

23      The "adverse interest" language under § 327(a) and the
24  "material adverse interest" prong of the "disinterested person"

25

26
27      33.  The dual requirement "serves the important policy of
    ensuring that all professionals appointed pursuant to section
    327(a) tender undivided loyalty and provide untainted advice and
28  assistance in furtherance of their fiduciary responsibilities."
    Rome, 19 F.3d at 58.

definition under § 101(14)(C) "telescope into what amounts to a single hallmark." Martin, 817 F.2d at 180.  This unitary hallmark is designed to filter out conflicts that may jeopardize a fair and equitable administration of the bankruptcy estate.

It is equally important in terms of policy that these rules are also meant to preserve the integrity of the bankruptcy system.  Therefore, in addition to avoiding conflicts detrimental to a particular case, the rules were drafted to avoid conflicts and questionable relationships that had historically cast the bankruptcy system itself in an unfavorable light.  See, e.g., In re Kendavis Indus. Int'l, Inc., 91 B.R. 742, 747 n.1 (Bankr. N.D. Tex. 1988) (citing legislative history of disinterestedness requirement).

"There can be a disqualifying conflict even absent proof of actual loss or injury." Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship, 248 B.R. 668, 695 (D. Mass. 2000).[34]  Further, a conflict need not be actual to be disqualifying.  "An actual conflict mandates disqualification of a professional to serve in a bankruptcy case.  A potential conflict also provides sufficient grounds for a court to deny a professional's employment." Shat, 2009 WL 7809004, at *6 (citation omitted); see also In re B.E.S. Concrete Prods., Inc., 93 B.R. 228, 236 (Bankr. E.D. Cal. 1988) ("Appearances count.  Even conflicts more theoretical than real

---

34.  See also In re Maui 14K, Ltd., 133 B.R. 657, 660 (Bankr. D. Hawaii 1991) (citation omitted) ("Denial of all compensation is justified regardless of actual harm to the estate.").

- 19 -

1 will be scrutinized.").[35]

2      In addressing the standards for removing a trustee due to a
3 conflict of interest, under § 324(a), the Ninth Circuit has
4 recognized that "a potential for a materially adverse effect on
5 the estate and an appearance of impropriety" may be sufficient,
6 and that the § 101(14)(C) definition of a disinterested person
7 "is broad enough to include a [person] with some interest or
8 relationship that would even faintly color the independence and
9 impartial attitude required by the Code." See Dye v. Brown (In
10 re AFI Holding) (AFI Holding II), 530 F.3d 832, 838 (9th Cir.
11 2008) (citing AFI Holding I, 355 B.R. at 149) (internal
12 quotations omitted).

13 **C. Application of the Employment Standards to Counsel's**
   **Employment**
14
       The employment of Counsel in this case is a textbook example
15
   of a professional who was actually disqualified from employment
16

17 _____

18      35.  The distinction between an actual conflict and a
   potential one is often difficult to draw; one court would
19 eliminate it altogether.

20      [W]henever counsel for a debtor corporation has any
        agreement, express or implied, with management or a
21      director of the debtor, or with a shareholder, or with
        any control party, to protect the interest of that
22      party, counsel holds a conflict.  That conflict is not
        potential, it is actual, and it arises the date that
23      representation commences.  This holding would apply
        equally to partnerships.  An attorney who claims to
24      represent a partnership, but also has some agreement,
        whether express or implied, with the general or limited
25      partners, or with any control person, to protect its
        interest, that attorney has an actual conflict of
26      interest, and is subject to disqualification and a
        disallowance of fees.  The concept of potential
27      conflicts is a contradiction in terms.  Once there is a
        conflict, it is actual -- not potential.
28
   Kendavis Indus., 91 B.R. at 754.

1  at the outset on two grounds:  he was not a disinterested person

2  (for two independent reasons), and he both held and represented

3  interests adverse to the estate.  The court takes each of these

4  disqualifying factors in turn.

5      **1.  Counsel was not a disinterested person.**

6          **a.  Counsel was himself a creditor.**

7      Counsel was not a disinterested person within the meaning of

8  the Bankruptcy Code, for two reasons.  First, Counsel had

9  represented Sundance in an earlier chapter 11 case; when the

10  present case was commenced, Sundance owed Counsel $3,000 for his

11  services in and in connection with the earlier case.[36]

12      Although there well may have been ways for Counsel to avoid

13  his creditor status,[37] Counsel did not avail himself of any of

14  those options; thus, he was clearly a creditor when he filed the

15  Sundance case.[38]  As a result, Counsel was, by definition, not a

16

17

18      36.   The time sheets filed with Counsel's interim
       application for compensation in the present case reveal that 10
19     hours of services (billed at $300 per hour) for which Counsel
       sought compensation in <u>this</u> case were in fact performed in the
20     <u>earlier</u> case.

21      37.   Counsel could have withdrawn $3,000 from his retainer
       before the new case was commenced, applied it to his pre-petition
22     services in the earlier case, and disclosed those circumstances
       to the court.  <u>See, e.g.</u>, <u>Kun v. Mansdorf (In re Woodcraft</u>
23     <u>Studios, Inc.)</u>, 464 B.R. 1, 14 (N.D. Cal. 2011) ("[A]ttorneys
       properly receive pre-filing compensation that they draw down
24     prior to filing -- so as to avoid the potential of being a
       pre-petition creditor of the estate -- and which are fully
25     disclosed so as to comply with disclosure laws.").  Or Counsel
       could have agreed to waive his $3,000 pre-petition claim against
26     the estate, and disclosed the same to the court.

27      38.   One who "has a claim against the debtor that arose at
       the time of or before the order for relief concerning the debtor"
28     is a creditor.  § 101(10)(A).  A "claim" is simply a "right to
       payment."  § 101(5)(A).

- 21 -

disinterested person.  § 101(14)(A).[39]  And when he applied for
and received approval of those pre-petition fees, as part of his
application for compensation in the instant case, he improperly
elevated a general unsecured claim to a priority administrative
expense.

**b.  Counsel had an interest materially adverse to the estate's interest by reason of his connection with Smith.**

Second, Counsel was not a disinterested person because by
virtue of his simultaneous representation of Smith in Smith's
personal chapter 13 case and his representation of the debtor-in-
possession in the Sundance case, Counsel had a direct
relationship to and connection with the debtor.  As explained
below, this relationship resulted in Counsel having "an interest
materially adverse to the interest of the estate."[40]  §
101(14)(C).

"Whether an interest is 'materially adverse' necessarily
requires an objective and fact-driven inquiry," which, in turn,
requires an analysis of the totality of the circumstances.  <u>AFI</u>
<u>Holding I</u>, 355 B.R. at 151 (adopted by the Ninth Circuit in <u>AFI</u>
<u>Holding II</u>, 530 F.3d at 838).  Smith's position as Sundance's
"Manager of Operations" and the level of control he exercised in
everything from financial reporting and projections, marketing
and pricing strategies, management of employees, negotiations

39.  "It is black-letter law that a 'creditor' is not
'disinterested.'"  <u>In re Kobra Props.</u>, 406 B.R. 396, 403 (Bankr.
E.D. Cal. 2009).

40.  A "disinterested person" does not have "an interest
materially adverse to the interest of the estate . . . by reason
of any direct or indirect relationship to, connection with, or
interest in, the debtor . . . ."  § 101(14)(C).

with creditors and suppliers, and providing support for virtually all the debtor's motions, as well as its plan, leave no doubt that Smith was a "person in control of the debtor."[41]  Thus, Smith fell within the Code's definition of an "insider."  See § 101(31)(C)(v).[42]

Counsel's representation of Smith in his chapter 13 case cannot be dismissed as a short-term or insubstantial one. Counsel filed Smith's petition less than one month after he had filed Sundance's petition and before Counsel filed his first application for approval of his employment in the Sundance case. The feasibility of Smith's chapter 13 plan depended in part on his income from Sundance.  It appears the sole reason for Smith's chapter 13 case was to enable him to keep his home.[43]  He

---

41.  Counsel's time sheets demonstrate that Smith was virtually Counsel's sole contact person for Sundance.  Counsel's communications with Brown were far fewer and generally included Brown's own attorneys; in other words, it appears that in Counsel's communications with Brown, Brown was usually acting on his own behalf, not as a representative of Sundance.

42.  The Code's list of examples is not exclusive.

[I]nsider status may be based on a professional or business relationship with the debtor, in addition to the Code's per se classifications, where such relationship compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties.

AFI Holding I, 355 B.R. at 152-53 (quoting Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman), 126 B.R. 63, 70 (9th Cir. BAP 1991)).

43.  Smith had no tax or other priority debt, and his plan proposed a 0% dividend on general unsecured claims.  Smith, however, had received a chapter 7 discharge in a case commenced two years earlier; thus, he was not eligible for a discharge in the chapter 13 case and in fact waived any discharge in that
(continued...)

1  succeeded, through Counsel, in valuing a second deed of trust
2  against the home at $0 and filed, through Counsel, an objection
3  to the first trust deed holder's claim, which the court converted
4  to an adversary proceeding.  Smith alleged his lender had failed
5  to honor a loan modification agreement and was wrongfully
6  foreclosing on the home.

7      In Smith's personal case, Counsel filed seven different
8  motions to confirm a chapter 13 plan -- one every two to four
9  months.  The first six motions were denied.  The seventh was
10 filed in February 2012, immediately after Smith's mortgage lender
11 agreed to a new loan modification agreement.  The motion was
12 granted and a chapter 13 plan was finally confirmed on April 11,
13 2012, coincidentally, the day before this court issued its ruling
14 denying confirmation of Sundance's plan of reorganization and
15 announcing its decision to grant relief from stay to the Bank.

16     Thus, Counsel was not just attorney of record but was
17 actively representing Smith -- during virtually the entire two-
18 year period of Sundance's chapter 11 case -- in Smith's two-year
19 battle to keep his home.  Almost as soon as Smith won that
20 battle, one of his primary sources of income, Sundance, was
21 losing its battle, a situation that would again put Smith in
22 danger of losing his home.  Thus, Smith had a powerful motive to
23 protect Sundance's property from foreclosure.

24     In short, during almost the entire pendency of the Sundance
25 case, Counsel owed his loyalty to two clients.  What transpired

27
28
43.(...continued)
case.  Thus, the plan had no effect on Smith's general unsecured
debt.

- 24 -

1   was that the interests of one client, Smith, in keeping his

2   income stream, and thus, his home, ran head-on into the fiduciary

3   duty of the other client, Sundance, to its creditors.  The result

4   was that Smith caused Sundance to divest its bankruptcy estate of

5   virtually its only asset at a time when Counsel was representing

6   both, and Counsel failed to investigate the scheme despite the

7   fact that Smith sought advice from him on the "many other

8   approaches" to the problem Smith was considering (Counsel's

9   words).

10       That the conflict of interest inherent in Counsel's

11  concurrent representation of Smith and Sundance was only a

12  possibility at the beginning of this case does not change the

13  analysis.  To be sure, when the conflict materialized, it became

14  a classic illustration of the reasons bankruptcy courts should

15  nip a potential conflict in the bud rather than await its

16  destructive effects.

17
18       **2.  Counsel held and represented interests adverse to the estate.**

19       The notion that a professional is not disinterested if he or

20  she has "an interest materially adverse to the interest of the

21  estate" and the requirement of § 327(a) that a professional "not

22  hold or represent an interest adverse to the estate" distill into

23  "a single hallmark."  <u>Martin</u>, 817 F.2d at 180.

24       As a creditor of the Sundance estate, Counsel held an

25  interest materially adverse to the interest of the estate.  And

26  when Counsel caused his pre-petition claim to be paid as an

27  administrative expense, he elevated his own interest above that

28  of the estate.

- 25 -

1   In addition, in representing Smith's personal interest as a
2  chapter 13 debtor, Counsel represented an interest adverse to the
3  Sundance estate.  Though it may not have been known at the outset
4  that this dual representation would develop into anything
5  nefarious, the potential was there all along, and in the end,
6  came to fruition.  When plan confirmation was denied and the stay
7  was lifted, with the prospect that Smith could lose a portion of
8  his income, and thus, his home, he scrambled to do whatever was
9  necessary to prevent the Bank from foreclosing on the Property.
10 Finally, he orchestrated the transfer of the Property to West
11 Coast, thereby divesting the estate of its only significant asset
12 and frustrating the effect of the court's orders granting relief
13 from stay and converting the case to chapter 7.[44]

14     It must have been clear to Counsel at the time that Smith
15 had in mind various courses of action outside the ordinary course

16

17     44.  It cannot be disputed that in doing so, Smith breached
   his fiduciary duty to the estate.  The fiduciary duties of a
18 trustee or a debtor-in-possession "also fall upon the officers
   and managing employees who conduct the debtor in possession's
19 affairs."  In re Centennial Textiles, 227 B.R. 606, 612 (Bankr.
   S.D.N.Y. 1998).  "Indeed, the willingness of courts to leave
20 debtors in possession is premised upon an assurance that the
   officers and managing employees can be depended upon to carry out
21 the fiduciary responsibilities of a trustee."  Commodity Futures
   Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985) (citation
22 omitted) (internal quotation marks omitted).

23     As fiduciaries, the debtor in possession and its
       managers are obligated to treat all parties to the case
24     fairly, maximize the value of the estate, and protect
       and conserve the debtor's property.  These duties
25     parallel those imposed by section 549 [unauthorized
       post-petition transfers]:  to avoid depletion of the
26     estate.  Not surprisingly, therefore, the debtor in
       possession and the managers breach their fiduciary
27     duties when they violate section 549.

28 Centennial Textiles, 227 B.R. at 612 (citations omitted)
   (emphasis added).

- 26 -

1 of Sundance's business, all designed to protect the Property from
2 foreclosure.  Yet Counsel failed to make clear to Smith what
3 Smith could and could not do without prior court approval and
4 outside the context of Sundance's pending case.  Counsel failed
5 to explore with Smith the various avenues Smith was
6 contemplating, and failed to caution him against taking any
7 action involving the Property that would conflict with Smith's
8 duties as a fiduciary to the Sundance estate and its creditors.

9 　　　As far as the court can tell, Counsel did not play a direct
10 role in the transfer.  But when Smith consulted him, Counsel was
11 duty-bound, as Sundance's attorney, to inquire into the details
12 of the many avenues Smith was considering and their possible
13 consequences to the estate and creditors, and to remind Smith of
14 his duty to maintain as his paramount concern the interests of
15 the Sundance estate and its creditors.[45]  Instead, Counsel simply

16

17

18 　　　45.  "A debtor in possession's attorney must be proactive,
i.e., prepared to render unsolicited legal advice regarding
preventative or corrective action that may be necessary for the
19 debtor in possession to properly discharge its fiduciary
obligations."  In re Count Liberty, LLC, 370 B.R. 259, 281
20 (Bankr. C.D. Cal. 2007) (emphasis added).

21 　　　Because the attorney for [a] debtor in possession is a
　　　fiduciary of the estate and an officer of the Court,
22 　　　the duty to advise the client goes beyond responding
　　　[to] the client's requests for advice.  It requires an
23 　　　active concern for the interests of the estate, and its
　　　beneficiaries, the unsecured creditors.  Consequently,
24 　　　the attorney may not simply close his or her eyes to
　　　matters having a legal and practical consequence for
25 　　　the estate -- especially where the consequences may
　　　have an adverse effect.  The attorney has the duty to
26 　　　remind the debtor in possession, and its principals, of
　　　its duties under the Code, and to assist the debtor in
27 　　　fulfilling those duties.

28 In re Wilde Horse Enters., Inc., 136 B.R. 830, 840 (Bankr. C.D.
Cal. 1991) (emphasis added).

- 27 -

1 sent Smith on his way with referrals to several other attorneys,
2 and in so doing, failed to avert the chicanery to which Smith
3 ultimately resorted.

4    In summary, Counsel's employment fell short of compliance
5 with either of the requirements of § 327(a).  From the moment the
6 petition was filed, Counsel was not a "disinterested person"
7 because he was a creditor of the estate.  From the moment he
8 began simultaneously representing Smith and Sundance, Counsel was
9 not a "disinterested person" for the additional reason that he
10 had an interest materially adverse to the interest of the estate
11 by virtue of his connections to Smith.  Similarly, for both these
12 reasons, Counsel held and represented interests adverse to the
13 estate.  Thus, Counsel was disqualified from employment as
14 attorney for the debtor-in-possession; accordingly, the court
15 will exercise its authority to deny allowance of any compensation
16 to Counsel pursuant to § 328(c).

17 **D.  Disclosure Requirements – Fed. R. Bankr. P. 2014(a)**

18    Rule 2014(a) establishes the procedure for the employment of
19 professionals by a trustee or debtor-in-possession.  It requires
20 the professional to file an application disclosing, "to the best
21 of the applicant's knowledge, all of the person's connections
22 with the debtor, creditors, any other party in interest, their
23 respective attorneys and accountants, the United States trustee,
24 or any person employed in the office of the United States
25 trustee."   Rule 2014(a).

26    "This rule assists the court in ensuring that the attorney
27 has no conflicts of interest and is disinterested, as required by
28 11 U.S.C. § 327(a)."   Neben & Starrett, Inc. v. Chartwell Fin.

- 28 -

1 | Corp. (In re Park-Helena Corp.), 63 F.3d 877, 881 (9th Cir.

2 | 1995).  The disclosure requirements of Rule 2014 are applied

3 | strictly, id., such that "the [professional] has the duty to

4 | disclose all relevant information to the court, and may not

5 | exercise any discretion to withhold information."  Woodcraft

6 | Studios, Inc., 464 B.R. at 8 (collecting cases).

7 | It is the bankruptcy court that determines whether a

8 | professional's connections render him or her unemployable under §

9 | 327(a) -- not the other way around.[46]

10 | The duty of professionals is to disclose all
connections with the debtor, debtor-in-possession,

11 | insiders, creditors, and parties in interest . . . .
They cannot pick and choose which connections are

12 | irrelevant or trivial. . . . No matter how old the
connection, no matter how trivial it appears, the

13 | professional seeking employment must disclose it.

14 | Park-Helena Corp., 63 F.3d at 882 (quoting another source).

15 | "The duty to disclose is a continuing obligation as to which

16 | the risk of defective disclosure always lies with the discloser.

17 | Disclosure that later turns out to be incomplete can be remedied

18 | by denial of fees."  In re Kobra Props., 406 B.R. at 402

19 | (citations omitted).  "Even a negligent or inadvertent failure to

20 | disclose fully relevant information may result in a denial of all

21 | requested fees."  Park-Helena Corp., 63 F.3d at 882.  Thus, if

22 | the bankruptcy court discovers that a professional holds an

23 | undisclosed adverse interest, the court has the power to deny all

24 | compensation and reimbursement of expenses.  Section 328(c);

25 | Woodcraft, 464 B.R. at 8; Kobra Props., 406 B.R. at 402 ("[T]his

26 |

27 | 46.  For a striking example of the consequences of not
disclosing connections in a bankruptcy case, see MILTON C. REGAN

28 | JR., EAT WHAT YOU KILL (The University of Michigan Press 2004);
United States v. Gellene, 182 F.3d 578 (7th Cir. 1999).

1  Sword of Damocles should be omnipresent in the mind of
2  counsel.").

3  **E.  Application of the Disclosure Standards to Counsel's**
   **Employment**
4
        **1.  Counsel's status as a creditor and his prior connection**
5       **with the debtor**

6      Counsel failed to disclose that he had represented Sundance
7  in an earlier case and that he was a creditor of Sundance; in
8  fact, as to both, he testified twice to the contrary.[47]  As seen
9  above, under black-letter law, Counsel's status as a creditor
10 would have rendered him ineligible to serve as counsel for the
11 debtor-in-possession.[48]

12     **2.  Counsel's compensation arrangements**

13     Counsel was required to file with the court "a statement of
14 the compensation paid or agreed to be paid" to him and "the
15 source of such compensation."  § 329(a).  More explicitly, he was
16 required to include in his fee applications "a statement as to
17 what payments [had] theretofore been made or promised to [him]
18 for services rendered or to be rendered in any capacity
19 whatsoever in connection with the case, [and] the source of the
20 compensation so paid or promised . . . ."  Rule 2016(a)  (emphasis
21 added).

22

23     47.  "I do not have a pre-petition claim against the Debtor
   or the Bankruptcy estate. . . .  Also, to the best of my
24 knowledge, . . . I have no prior connection with the Debtor . . .
   ."  Counsel's Employment Decls. at 2:7, 2:10-12.
25
        48.  In Woodcraft, the bankruptcy court denied all
26 compensation to an attorney who failed to disclose he had
   performed work for the debtor in preparation for the filing for
27 which he had not drawn down on his retainer; in other words, for
   failing to disclose that he was a pre-petition creditor.  See 464
28 B.R. at 5-6.  The decision was affirmed by the district court.
   Id. at 10.

- 30 -

  
1    In his Rule 2016(b) statement, filed with the petition in

2  the Sundance case, when asked to identify the source of the

3  compensation to be paid to him, Counsel checked the box "Debtor";

4  he did not check the box "Other (specify)."  His signature on

5  that document was a certification that "the foregoing is a

6  complete statement of any agreement or arrangement for payment to

7  [him] for representation of the debtor(s) in this bankruptcy

8  proceeding."[49]

9    That statement was untrue.  On August 8, 2012, in his second

10  declaration in response to the OSC, Counsel disclosed for the

11  first time that Smith had told him Brown would cover his

12  attorney's fees.  Counsel recalled telling the Bank's counsel, in

13  response to her concern that cash collateral would be used, that

14  "if any money were to be paid to [him] it would come from the

15  Debtor's principals."[50]  Thus, apparently, Counsel was relying

16  solely on Brown, and not on the debtor, for any compensation over

17  and above the amount of his retainer.  This is a disclosure

18  Counsel was required to make in his Rule 2016(b) statement and in

19  his fee applications, pursuant to Rule 2016(a), but did not.[51]

20  / / /

21

22

23    49.  Disclosure of Compensation of Attorney for Debtor(s),
    filed June 25, 2010, p. 29 of Dkt. No. 1.

24    50.  Counsel's Decl. #2, 5:14-18.

25    51.  In Park-Helena Corp., the debtor's counsel stated in
    its Rule 2016 statement that its retainer had been "paid by the
26  debtor," when in fact, it had been paid by the debtor's president
    from his personal checking account.  The court rejected counsel's
27  argument that the check represented funds the president owed to
    the debtor, and thus, that the retainer was actually paid with
28  funds of the debtor.  63 F.3d at 881.  Thus, the court affirmed
    the bankruptcy court's denial of all fees.  Id. at 882.

1    The rule makes no distinction for a "verbal" promise, as
2  Counsel characterizes it.   Nor is it relevant that Counsel made
3  the disclosure to the Bank's counsel:   the rule requires
4  disclosure to the court.[52]  Further, Counsel would be hard-pressed
5  to now argue Brown's promise was not a firm promise:   it is clear
6  Counsel intended the Bank's counsel to rely on it to conclude
7  that additional payments to Counsel would not be made from the
8  Bank's cash collateral.   Finally, Counsel's current conclusion
9  that "the verbal promise to pay had no effect on [his] loyalty to
10  the debtor"[53] is dismissed:   it is self-serving, after the fact,
11  irrelevant, and again, simply not Counsel's conclusion to draw.

12        ### 3.  Counsel's connections to Smith

13        The impetus for the OSC was the court's concern that Counsel
14  may have played a role in the transfer of the Property from
15  Sundance to West Coast.   The court had no inkling at the time it
16  issued the OSC that Counsel had concurrently represented Smith
17  during almost the entire pendency of the Sundance case or that
18  Counsel may have utilized Smith's tax preparation services.

19        As indicated above, in the OSC, the court quoted the
20  sections from the Code establishing the requirements that
21  bankruptcy professionals must not hold or represent an interest
22  adverse to the estate and must be disinterested; the court also
23  set forth the policies underlying these requirements.

24  / / /

25

26        52.  See Shat, 2009 WL 7809004, at *9 (holding disclosure to
27  U.S. Trustee's office, rather than to court, not sufficient for
    purposes of Rule 2014(a)).

28        53.  Counsel's Decl. #2, 5:20-21.

Counsel's first declaration in response to the OSC was, as discussed above, ambiguous.  He stated only that at the time of the hearing on the U.S. Trustee's motion to dismiss or convert the case, he did not know a grant deed had been prepared or recorded; he had no role in preparing or recording it; he had no role in arranging or assisting with West Coast's chapter 11 filing; and he had no meetings or discussions with Smith, Brown, or Mokarram regarding the grant deed before it was recorded or regarding the West Coast case before the petition was filed.

Counsel closed his first declaration as follows:  "I do not and have not represented an interest adverse to the estate. . . . I was always a 'disinterested person' in my representation of the estate."[54]

In response to the U.S. Trustee's concerns, the second declaration revealed that Counsel knew Smith was contemplating a chapter 11 filing by someone or some entity, among other courses of action.  After further poking and prodding by the court, Counsel disclosed in the third declaration that he understood Sundance had a co-owner in the Property and that the co-owner might be contemplating a bankruptcy filing, but he made no further inquiry.[55]

Despite the court's concerns, at no point did Counsel disclose -- in any of his first three declarations in response to

_____

54.  Counsel's Decl. #1, 5:1, 5:4.

55.  "Since I had not been paid anything post-petition in the case, I did not think that Don Smith would pay another Attorney to explore any other options because I didn't think there was [sic] available funds.  I thought that the case would end in either a trustee litigating with US Bank or the property being foreclosed or a short sale."  Counsel's Decl. #3, 4:7-12.

the OSC -- that he had been and was still representing Smith in

Smith's own chapter 13 case, a case in which the feasibility of

Smith's very recently confirmed plan had become shaky because of

what had happened in the Sundance case.  Nor did Counsel

disclose, until his fourth declaration, that he, one of his

corporations, and one of his employees may have been tax clients

of Smith's.[56]

Counsel had numerous opportunities to supplement his grossly

inadequate initial disclosures, knowing the court had serious

concerns about the transfer of the Property and the nature of

Counsel's connections.  Remarkably, Counsel filed three separate

declarations, each in response to the court's insistence on

further information, each time revealing more about his dealings

with Smith regarding Sundance, yet not once did Counsel disclose

that he had been and was still representing Smith personally.

Instead, it was the court's own fortuitous discovery, immediately

before the second hearing on the OSC and after the first three

declarations had been filed, that revealed what was clearly a

connection disqualifying Counsel from employment in this case.

After the court brought to Counsel's attention that it had

discovered the connection, in a last-ditch effort to justify his

omission, Counsel stated he "understood Don Smith to be an

independent contractor consultant charged with the duty to

---

56.    It is particularly troubling that, although the court
had made clear to Counsel that his undisclosed connections with
Smith were of grave concern, Counsel still did not bother to
determine with certainty whether Smith had provided the tax
services mentioned in Counsel's fourth declaration.  This
underscores Counsel's cavalier attitude and mindless approach
toward the disclosure requirements.

1   oversee management of Sundance through reorganization."[57]   Counsel
2   did not see this as a "connection with the Debtor" that "had any
3   relevance to the case."[58]

4        Aside from whether this statement was genuine, in making
5   this determination, Counsel appointed himself the arbiter of his
6   status as a disinterested person and as the holder or
7   representative of an interest adverse to the estate in the
8   Sundance case.   Thus, he defied the fundamental rule that the
9   attorney does not get to pick and choose what connections to
10   disclose based on his or her own perceptions of their relevance.[59]

11        The court has previously found it necessary to admonish
12   Counsel in other cases of the need for full, candid, and accurate
13   disclosures in regard to employment and bankruptcy cases
14   generally.   Despite these cautions and the repeated opportunities
15   he had to bring these critical connections to light, Counsel
16   failed to do so.   Counsel's failure to disclose these connections
17   at the outset may well have played a part in the debacle that
18   followed -- namely, the transfer of the Property.   Further, the
19   transfer of the Property after relief from stay was granted, and
20   Counsel's woeful failure to disclose his connections in the case,
21   are the sorts of things that negatively affect the public's

22
23
24   _____

25        57.   Counsel's Decl. #4, 3:24-26.

26        58.   Id. at 4:3-5.

27        59.   "This decision should not be left to counsel, whose
     judgment may be clouded by the benefits of the potential
28   employment."   In re Lee, 94 B.R. 172, 176 (Bankr. C.D. Cal.
     1988).

1  confidence in the judicial system and the bar.[60]

2      Bankruptcy is a realm in which "the paramount requirement
3  [is] that the court act so as to assure public confidence in the
4  integrity of the judicial process." <u>Kobra Props.</u>, 406 B.R. at
5  405.  Here, Counsel took it upon himself to determine which
6  connections and compensation arrangements to disclose and which
7  not to disclose; in doing so, he interfered with the court's
8  exercise of its duty.  If he had made the appropriate and
9  required disclosures at the beginning, his employment would have
10  been denied, and this regrettable and unnecessary episode would
11  never have transpired.

12                 **III.   CONCLUSION**

13      Counsel's connections with the debtor and its
14  representatives so obviously should have been disclosed that
15  Counsel's failure to disclose them reduced the preparation and
16  signing of his declarations supporting his employment to a
17  perfunctory exercise as to which he either gave no thought at all
18  or made grossly incorrect choices.  Moreover, Counsel's failure
19  to make the necessary disclosures as various developments in the
20  case arose, including after the court had plainly expressed the
21  seriousness of the situation, exacerbated the problem.

22      For the reasons stated, the court concludes that at all
23  times during his representation of the debtor in possession in

24

25  _____
26      60.  "The paramount concern must be to preserve public trust
in the scrupulous administration of justice and the integrity of
the bar.  The important right to counsel of one's choice must
27  yield to ethical considerations that affect the fundamental
principles of our judicial process."  <u>People ex rel. Dep't of</u>
28  <u>Corporations v. SpeeDee Oil Change Systems, Inc.</u>, 20 Cal. 4th
1135, 1145 (1999).

this case, Counsel was not a disinterested person and held an
interest adverse to the interest of the estate.  The court also
concludes that from, at the latest, the date Smith's chapter 13
petition was filed, Counsel represented an interest materially
adverse to the estate.  Finally, the court concludes that
Counsel, from the time he filed his first employment application
until he filed his fourth declaration in response to the OSC,
exhibited a casual -- if not willful -- disregard of his
disclosure obligations under the Code and the Rules.  For all
these reasons, all compensation for services and reimbursement of
expenses will be denied, and all funds Counsel has received in or
in connection with this case or with Sundance's prior chapter 11
case must be disgorged, within 10 days from the date of the order
issued herewith, to the Sundance chapter 7 trustee for the
benefit of the estate.

The court will issue an appropriate order.

Dated: Nov. 6 , 2012

*Robert Bardwil*
ROBERT S. BARDWIL
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

CERTIFICATE OF MAILING

The undersigned deputy clerk in the office of the United
States Bankruptcy Court for the Eastern District of California
hereby certifies that a copy of the document to which this
certificate is attached was mailed today to the following
entities at the addresses shown below or on the attached list.

C. Anthony Hughes
1395 Garden Highway, Ste.
150
Sacramento CA 95833

Sundance Self-Storage-El
Dorado LP
2341 Hidden Acres Dr
El Dorado Hills CA 95762

Thomas A. Aceituno
PO Box 189
Folsom CA 95763

Gregory J. Hughes
3017 Douglas Blvd #300
Roseville CA 95661

Office of the U.S. Trustee
Robert T Matsui United
States Courthouse
501 I Street, Room 7-500
Sacramento CA 95814

DATED: 11/7/12          By: _____
                             Deputy Clerk

                                              mgas

EDC 3-070 (Rev. 6/28/10)